IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON


JOHN MITCHELL, as Trustee of                    04-CV-1359-BR
the Bankruptcy Estate of
PAMELA SCHMITZ,                                 OPINION AND ORDER

          Plaintiff,

v.

TRI-COUNTY METROPOLITAN
TRANSPORTATION DISTRICT, an
Oregon municipal corporation,
d/b/a TRI MET; and MIKE GROVE,
individually and in his official
capacity,

          Defendants.


SCOTT N. HUNT
MATTHEW B. DUCKWORTH
Busse & Hunt
621 S.W. Morrison Street, Suite 521
Portland, OR  97205
(503) 248-0504

          Attorneys for Plaintiff

**JANA TORAN**
Tri-Met
4012 S.E. 17th Avenue
Portland, OR  97202
(503) 962-5650

        Attorneys for Defendants

**BROWN, Judge.**

     This matter comes before the Court on Defendants' Motion for

Summary Judgment (#18) and Defendants' Motion to Strike Portions

of Plaintiff's Affidavit in Opposition to Summary Judgment (#36).

     Plaintiff brings this action against Defendants as Trustee

of the bankruptcy estate of Pamela Schmitz.[1]  Defendant Tri-

---

     [1] Schmitz filed for bankruptcy protection on September 12,
2003.

        A bankruptcy trustee is the representative of the
        bankrupt estate, and has the capacity to sue and be
        sued.  *See* 11 U.S.C. § 323.  Among the trustee's duties
        is the obligation to 'collect and reduce to money the
        property of the estate.'  *Id.* § 704(1).  The 'property
        of the estate' includes 'all legal or equitable
        interests of the debtor in property as of the
        commencement of the case,' *id.* § 541(a)(1), including
        the debtor's 'causes of action.'  *United States v.
        Whiting Pools, Inc.*, 462 U.S. 198, 205 n. 9, 103 S.Ct.
        2309, 76 L.Ed.2d 515 (1983) (internal quotation marks
        and citation omitted).  Thus, '[u]nder the Bankruptcy
        Code the trustee stands in the shoes of the bankrupt
        [party] and has standing to bring any suit that the
        bankrupt [party] could have instituted had it not
        petitioned for bankruptcy.'  *Shearson Lehman Hutton,
        Inc. v. Wagoner,* 944 F.2d 114, 118 (2d Cir. 1991)
        (citations omitted).

*Smith v. Arthur Andersen LLP,* 421 F.3d 989, 1002 (9th Cir. 2005).

County Metropolitan Transportation District (Tri-Met) is
Schmitz's employer, and Defendant Mike Grove is a manager at Tri-
Met. Plaintiff asserts claims on behalf of Schmitz under the
Americans with Disabilities Act (ADA), 42 U.S.C. 12110, *et seq.,*
and Oregon's statutory equivalent, Or. Rev. Stat. § 659A.885.
Plaintiff also asserts claims for violation of Schmitz's right to
equal protection under the Fourteenth Amendment to the United
States Constitution and a state common law claim for intentional
infliction of emotional distress.

For the reasons that follow, the Court **DENIES** Defendants'
Motion to Strike and **GRANTS in part** and **DENIES in part**
Defendants' Motion for Summary Judgment.


## FACTS

The following facts are drawn from the admissible evidence
in the record and viewed in the light most favorable to
Plaintiff.

Schmitz was hired by Tri-Met in May 1996 at the Powell
Maintenance Facility known as the Powell garage. She has held
various maintenance positions during her tenure with Tri-Met.
Grove is the manager of the Powell garage, but he was not
Schmitz's immediate supervisor. At all relevant times, Schmitz
was a member of the Amalgamated Transit Union (ATU). Tri-Met and
ATU operate under a collective bargaining agreement called the

Working and Wage Agreement (WWA).

Throughout her employment with Tri-Met, Schmitz had numerous absenteeism issues. Between January 1998 and September 2003, Schmitz received fifteen letters from Tri-Met concerning her absenteeism. On January 25, 2000, Tri-Met placed Schmitz on "lost time conditions" for a period of one year. Lost time conditions limit the time an employee may take as sick leave.

In August 2002, Schmitz had surgery on her Achilles tendon and took time off under the Family Medical Leave Act (FMLA). Schmitz was unable to return to work until January 6, 2003, due to the Achilles tendon condition. Before she was able to return to work, however, Schmitz was diagnosed with non-Hodgkins lymphoma. On January 27, 2003, William Graham, D.O., Schmitz's doctor, wrote to Grove and confirmed Schmitz's cancer diagnosis. Dr. Graham informed Grove that Schmitz would require extensive treatment and additional time off from work.

On February 4, 2003, Schmitz started chemotherapy. Schmitz ultimately underwent seven rounds of chemotherapy to treat her lymphoma over a period of approximately four or five months. The treatment caused extreme fatigue, illness, and other side effects.

In May 2003, Christopher Nogeire, M.D., Schmitz's oncologist, examined Schmitz following her sixth round of chemotherapy. Dr. Nogeire reviewed Schmitz's CT scans and

estimated there had been 85-90% regression by volume in the tumor. Dr. Nogeire concluded Schmitz's treatment, however, was not "heading toward a complete wipeout of the cancer," and she was "encountering resistant disease." Dr. Nogeire recommended Schmitz switch to an alternative chemotherapy known as "ICE." Dr. Nogeire also noted Schmitz "is very concerned about persistent absence from work but I told her we should not compromise the chemo that I think will give her the best chance, to comply with her work schedule."

Schmitz underwent one round of ICE treatment in May 2003. This treatment also caused considerable nausea and other unpleasant side effects. On June 11, 2003, Schmitz saw Dr. Nogeire for a follow-up. In his notes, Dr. Nogeire confirms the ICE treatment "caused considerable nausea and GI toxicity and very low blood counts requiring antibiotic and growth-factor support." Dr. Nogeire noted, however, that Schmitz's "treatment plan is straightforward and even clearer now. The problems are social ones." Dr. Nogeire also noted:

> She has issues with her job and her insurance and decided to stop the treatment. I planned on giving her two cycles of the treatment, repeat the CT scan with a PET scan reserved for subsequent evaluation. I jumped ahead, did the PET scan on the premise if the PET scan was negative it would imply that the residual tumor masses in her abdomen were dead tissue and we could re-define the stopping point. The PET scan shows that the cancer has been greatly shrunk but is not gone so the logical next step is to give

> another cycle of treatment and recheck the CT
> scan and possibly PET scan and decide how
> many treatments beyond the point of complete
> remission should be given.  The patient
> thought about this and is unsure that she
> will accept further treatment and wants me to
> make compromises.  I can only give her our
> best interpretation of the clear data we have
> and our best recommendation still hoping to
> achieve a durable, complete remission.  Now
> whether she cooperates or not is up to her;
> she saw the films and heard the entire
> strategy spelled out for her.

Schmitz testified she was "sort of uncertain" about whether to continue treatment at the time of the June 2003 appointment with Dr. Nogeire.  She does not recall asking Dr. Nogeire to make compromises.

In July 2003, Schmitz was approaching 12 months of continuous time off from work.  Under the WWA between Tri-Met and ATU, "continuity of service shall be broken and seniority shall terminate" when an employee is absent for 12 months due to sickness.  In such circumstances, Tri-Met is required to provide 30 days written notice of the broken continuity of service and termination of seniority to ATU and to the employee. Accordingly, on July 16, 2003, Grove sent a letter to Albert Zullo, ATU President, with a copy to Schmitz.  In the letter, Grove states Schmitz would be placed on "medical termination status" on August 17, 2003, if she did not return to work and complete 30 calendar days in her regular work assignment.

Before he sent the letter, Grove telephoned Schmitz to let

her know the letter was coming and to explain the medical termination decision.  In an Affidavit, Grove stated Schmitz told him during this conversation that she had stopped chemotherapy and intended to return to work.  Grove also testified at his deposition that Schmitz told him about the physical side effects of her cancer treatment, including nausea, weight loss, and generally "feeling really bad."  Grove understood Schmitz had decided to discontinue her treatment because of the side effects. Schmitz, however, testified she did not tell Grove she had decided to stop her treatment, and she did not make the decision to stop treatment until after she received the letter from Grove.

After she received Grove's July 16, 2003, letter, Schmitz contacted David Kay, her union representative.  She asked Kay to find out whether she could get an extension of her leave so she could finish her cancer treatment.  Kay contacted Grove and discussed Schmitz's options.  Kay told Grove Schmitz would be unable to continue her cancer treatment if she was required to return to work.  Grove said he understood Schmitz was not going to continue her treatment in any event, but the union would need to write a letter to Tri-Met if Schmitz wanted to extend her leave beyond one year.  Grove testified, however, he did not believe Kay was telling him that Schmitz needed an extension of her leave nor that he was asking for an extension on Schmitz's behalf.

On August 8, 2003, Tri-Met representatives met with ATU representatives to attempt to resolve several pending grievances. Colleen Sexton, Director of Human Resources, and Michael Ford, Director of Transportation Operations, attended on behalf of Tri-Met. Zullo attended on behalf of the Union. Schmitz's request for an extension of her one-year leave was discussed at the meeting. Sexton understood Schmitz needed an extension of leave because of her cancer. It appears, however, Tri-Met did not take any action regarding Schmitz's request for an extension of leave as a result of the August 8, 2003, meeting.

Schmitz returned to work on August 15, 2003. Schmitz believed Tri-Met would be required under the WWA to allow her another year of leave if she worked for 30 calendar days. In her Affidavit, Schmitz testified she intended to resume her chemotherapy in September when she qualified for additional leave.

When Schmitz returned to work, Grove did not speak to her and treated her in a manner Schmitz believed was intimidating. Schmitz asserts Grove "invaded her space" by standing directly behind her at three or four meetings. Plaintiff reported Grove's conduct to David Kay and Ed Trimpler, her shift supervisor, and the conduct stopped.

On September 16, 2003, Schmitz met with Grove and Kay to discuss her absence record. Following the meeting, Grove wrote

Schmitz a lengthy letter outlining the discussion and Schmitz's absence history over the previous five years.  Grove noted that over the last 12 months Schmitz had "accumulated 1,672 hours of sick [leave] not covered by FMLA."  Grove also noted Schmitz had been placed on lost time conditions in January 2000.  "Due to excessive lost time and being placed on lost time conditions in 2000," Grove again imposed lost time conditions on Schmitz.  The lost time conditions limited Schmitz to 80 hours of sick leave in the following 12 months, prohibited unexcused absences, and required Schmitz to provide a doctor's certificate for each and every absence due to illness.  The conditions were to remain in place from September 16, 2003, through September 15, 2004.

Schmitz filed two grievances in response to the imposition of lost time conditions.  Schmitz objected to the 80-hour limit on sick leave because Tri-Met employees accrue eight hours of sick leave for every 160 hours worked or 104 hours in a year.  Schmitz also argued she should have been "placed on the sick letter"[2] rather than on lost time conditions.  In addition, Schmitz asked that the lost time conditions run from August 15, 2003, which was the date she returned to work.

On October 15, 2003, a Step I hearing was held concerning Schmitz's grievances.  On October 29, 2003, Grove issued a letter

_____

[2] The parties do not explain what this means, but it apparently is a reference to provisions in the WWA.

deciding the grievances.  Grove agreed to change the start date
of Schmitz's lost time conditions from September 16, 2003, to
September 1, 2003.  Grove, however, denied Schmitz's other
requests.

Pursuant to the WWA, Schmitz requested a Step II hearing of
her denied grievances.  On January 21, 2004, the Step II hearing
was convened before Tri-Met's Grievance Committee.  At the
hearing, David Kay, Schmitz's union representative, acted as
Schmitz's advocate.  When Kay asserted Schmitz's rights under the
ADA had been violated, Sexton, one of the grievance committee
members, stopped the hearing because it was not the proper forum
for exploring Schmitz's possible need for accommodation under the
ADA.  Sexton testified in her deposition that she knew Tri-Met
had not engaged in the interactive process with Schmitz and Tri-
Met needed to accomplish that outside of the grievance forum.

Sexton asked Kay and Schmitz to meet with Carol Jolly, Tri-
Met's Employee Relations Director.  Thereafter Jolly met with
Schmitz and Kay and conducted an investigation into Schmitz's
request for reasonable accommodation.  Jolly ultimately
determined Schmitz was entitled to reasonable accommodation under
the ADA in the form of adequate medical leave to pursue her
cancer treatment.  In addition, Jolly determined neither
Schmitz's previous time off due to her cancer treatment nor any
future time off for cancer treatment should be counted against

her, and the September 16, 2003, lost time conditions letter
should be removed from her personnel file.  Accordingly, Anton
Bryant, Director of Bus Maintenance, removed the September 16,
2003, lost time conditions letter from Schmitz's file.

As of the date Plaintiff filed his Memorandum in Opposition
to Defendants' Motion for Summary Judgment, Schmitz had not
resumed her treatment and was performing her regular work at Tri-
Met.


## STANDARDS

Fed. R. Civ. P. 56(c) authorizes summary judgment if no
genuine issue exists regarding any material fact and the moving
party is entitled to judgment as a matter of law.  The moving
party must show the absence of an issue of material fact.  *Leisek
v. Brightwood Corp.*, 278 F.3d 895, 898 (9th Cir. 2002).  In
response to a properly supported motion for summary judgment, the
nonmoving party must go beyond the pleadings and show there is a
genuine issue of material fact for trial.  *Id.*

An issue of fact is genuine "'if the evidence is such that a
reasonable jury could return a verdict for the nonmoving party.'"
*Villiarmo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th
Cir. 2002) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S.
242, 248 (1986)).  The court must draw all reasonable inferences
in favor of the nonmoving party.  *Id.*  A mere disagreement about

a material issue of fact, however, does not preclude summary judgment. *Jackson v. Bank of Haw.*, 902 F.2d 1385, 1389 (9th Cir. 1990).

The substantive law governing a claim or a defense determines whether a fact is material. *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000). If the resolution of a factual dispute would not affect the outcome of the claim, the court may grant summary judgment. *Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 919 (9th Cir. 2001).

## **DISCUSSION**

Plaintiff alleges Defendants discriminated against Schmitz based on her disability when they failed to reasonably accommodate her, retaliated against her for seeking accommodation, and created a hostile work environment. Plaintiff asserts identical claims under both the ADA and Or. Rev. Stat. § 659A.885. Neither party contends a different analysis applies to the state and federal claims.

## I. **Failure to Accommodate.**

Schmitz alleges Defendants discriminated against her when they failed to provide reasonable accommodation for her disability by extending her medical leave in August 2003. Defendants, however, contend they are entitled to summary judgment as to this claim because Schmitz did not request any

reasonable accommodation.

The ADA provides "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability . . . ."  42 U.S.C. § 12112(a).  Under the ADA, the term "discriminate" includes the failure to provide reasonable accommodation for "the known physical or mental limitations of an otherwise qualified individual with a disability" unless the employer can show the accommodation would impose an undue hardship.  42 U.S.C. § 12112(b)(5)(A).

The ADA defines "qualified individual with a disability" as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).  The ADA defines "disability" as "a physical or mental impairment that substantially limits one or more of the major life activities."  42 U.S.C. § 12102(2).  For the purposes of their Motion for Summary Judgment, Defendants concede Schmitz is a qualified person with a disability.

After "an employer becomes aware of the need for accommodation, that employer has a mandatory obligation under the ADA to engage in an interactive process with the employee to identify and implement appropriate reasonable accommodations." *Humphrey v. Mem'l Hosp. Ass'n*, 239 F.3d 1128, 1137 (9th Cir. 2001).  The purpose of the interactive process is to identify and

to develop a reasonable accommodation. "The interactive process requires communication and good-faith exploration of possible accommodations between employers and individual employees, and neither side can delay or obstruct the process." *Humphrey*, 239 F.3d at 1137. "Employers who fail to engage in the interactive process in good faith, face liability for the remedies imposed by the statute if reasonable accommodation would have been possible." *Id.*

In its Motion, Tri-Met argues it did not know about Schmitz's need for accommodation until January 2004, and, therefore, it was not required to engage in the interactive process until that time. Tri-Met contends Schmitz's request for extended leave was not sufficient to trigger Tri-Met's duties under the ADA because extended leave is not a reasonable accommodation.

Tri-Met, however, ignores established law and its own conduct. "Unpaid medical leave may be a reasonable accommodation under the ADA. Even an extended medical leave, or an extension of an existing leave period, may be a reasonable accommodation if it does not pose an undue hardship on the employer." *Nunes v. Wal-Mart Stores, Inc.*, 164 F.3d 1243, 1247 (9th Cir. 1999). Defendants do not argue additional medical leave for Schmitz would have constituted an undue hardship for Tri-Met. In fact, Tri-Met offered Schmitz additional medical leave in January 2004.

Viewing the record in the light most favorable to Plaintiff, the Court concludes a rational juror could find May's request for accommodation on Schmitz's behalf at the August 8, 2003, meeting was sufficient to trigger Tri-Met's obligation to ask questions regarding the nature of Schmitz's disability and her functional limitations in order to identify an effective accommodation.

In light of this issue of material fact, the Court concludes Defendants are not entitled to summary judgment as to Plaintiff's claim that Tri-Met violated the ADA by failing to accommodate Schmitz.

## II. Retaliation

To establish a *prima facie* case of retaliation, Plaintiff must show she engaged in protected activity under Title VII, her employer subjected her to an adverse employment action, and a causal link exists between the protected activity and the adverse employment action. *See Ray v. Henderson*, 217 F.3d 1234, 1240 (9th Cir. 2000).

Plaintiff alleges Defendants took adverse actions against Schmitz in retaliation for her request for additional medical leave, including issuing the lost time conditions letter, restricting her use of sick leave, interfering with her ability to continue her cancer treatment, and considering her past authorized absences as a basis for disciplinary action.

Defendants, however, contend they are entitled to summary

judgment as to this claim because 1) Schmitz never requested accommodation and, therefore, did not engage in protected activity; 2) Tri-met followed "well-established neutral policies" contained in the WWA, and, therefore, Tri-Met's imposition of lost time conditions was not discriminatory; and 3) Tri-Met made the decision to place Schmitz on lost time conditions before her cancer diagnosis, and, therefore, a causal connection does not exist between the alleged adverse action and Schmitz's request for accommodation. The Court, however, concludes Defendants are not entitled to summary judgment as to this claim because the relevant facts are disputed.

As noted, Schmitz requested reasonable accommodation via her union representative in August 2003. Moreover, the record contains evidence from which a fact-finder could conclude Tri-Met was well aware of Schmitz's illness, her need for treatment, and her need for additional leave to obtain treatment before the August 2003 meeting. In addition, the record does not establish as a matter of undisputed fact whether Tri-Met's decision to place Schmitz on lost time conditions was made before her cancer diagnosis nor whether Schmitz's request for additional leave played a part in Tri-Met's decision.

In his September 16, 2003, letter, Grove states the lost time conditions are a result of "excessive lost time," including the 1,672 hours of lost time in the past 12 months. Moreover,

after Tri-Met finally evaluated Schmitz's request for additional leave in January 2004, it concluded the lost time conditions letter was inappropriate and should be removed from Schmitz's file presumably to avoid any discrimination against her on the basis of her disability.

In short, a reasonable fact-finder could conclude from this record that Schmitz's request for accommodation was a factor in Tri-Met's decision to impose lost time conditions. Accordingly, the Court concludes Defendants are not entitled to summary judgment as to Plaintiff's retaliation claim.

## III. Hostile Work Environment

Plaintiff contends Tri-Met subjected Schmitz to a hostile work environment because of her disability. Tri-Met, however, asserts the conduct Schmitz complains about does not rise to the level of a hostile work environment.

The Ninth Circuit has not recognized a hostile work environment claim under the ADA and has expressly declined to decide whether such a claim exists. *See Brown v. City of Tucson*, 336 F.3d 1181, 1190 (9th Cir. 2003). A number of courts, however, have acknowledged the possibility of such a claim. For example, in *Walton v. Mental Health Ass'n of S.E. Pa.*, the Third Circuit applied the Title VII framework and analysis to hostile work environment claims under the ADA because the "'Supreme Court has held that language in Title VII that is almost identical to

. . . language in the ADA creates a cause of action for a hostile work environment.'" 168 F.3d 661, 666 (3d Cir. 1999). If such a cause of action exists, therefore, the elements would be similar to those required under the Title VII framework.

Under the Title VII framework, harassment can be a form of discrimination. *See Brooks v. City of San Mateo*, 229 F.3d 917, 923 (9th Cir. 2000). Thus, to establish a *prima facie* case of hostile work environment based on her disability, Schmitz must show 1) she is a qualified individual with a disability, 2) she was subjected to verbal or physical harassment because of her disability, 3) the conduct was unwelcome, and 4) the conduct was sufficiently severe or pervasive to alter the conditions of employment and to create an abusive working environment. *Walton*, 168 F.3d at 667. *See also McConathy v. Dr. Pepper/Seven Up Corp.,* 131 F.3d 558, 563 (5th Cir. 1997). For the Court to determine whether the conduct was sufficiently severe or pervasive, Schmitz must prove she subjectively felt the conduct was abusive and that a reasonable person would find the conduct was hostile or abusive. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21-22 (1993). Factors a court may consider include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 23.

As noted, Tri-Met concedes Schmitz is a qualified individual with a disability for purposes of this Motion.  As to the remaining elements of her *prima facie* case, Schmitz contends the following conduct created a hostile work environment: Grove contacted her repeatedly at home during the time she was receiving cancer treatment, requested she return to work even though he knew she was receiving cancer treatment, and also asked Schmitz to provide Tri-Met with doctor's notes.  Schmitz also asserts Tri-Met sent her "time loss letters" with handwritten notes telling her to call to set up a time to discuss her time loss.  Schmitz also contends Grove called her three or four times while she was off work for cancer treatment in an effort to find out her medical status.  Schmitz asserts Grove did not speak to her and treated her in an intimidating manner after she returned to work.  Finally, Schmitz also maintains Grove "invaded her space" by standing directly behind her at three or four meetings. Plaintiff, however, admits Grove's conduct stopped after she reported it to David Kay and Ed Trimpler, her shift supervisor.

Applying the *Harris* factors to this record, the Court concludes none of the incidents about which Schmitz complains, either individually or in combination, are sufficiently severe or pervasive to establish a *prima facie* discrimination claim for hostile work environment based on disability.

Accordingly, Tri-Met is entitled to summary judgment on

19 - OPINION AND ORDER

Plaintiff's discrimination claim for hostile work environment based on disability.

**IV.  Intentional Infliction of Emotional Distress**

To establish a claim for intentional infliction of emotional distress under Oregon law, the plaintiff must establish the following elements:

> 1) the defendant intended to inflict severe emotional distress on the plaintiff; 2) defendant's acts were the cause of plaintiff's severe emotional distress; and 3) defendant's acts constituted an extraordinary transgression of the bounds of socially tolerable conduct.

*Meade v. Cedarapids, Inc.*, 164 F.3d 1218, 1223 (9th Cir. 1999).

"Whether conduct constitutes an extraordinary transgression of the bounds of socially tolerable conduct is a question of law." *Harris v. Pameco Corp.*, 170 Or. App. 164, 171 (2000).

> The inquiry is whether defendant's conduct constitutes extraordinary conduct which a reasonable jury could find beyond the farthest reaches of socially tolerable behavior.  Conduct that is merely rude, boorish, tyrannical, churlish and mean does not satisfy that standard[.]  A court may consider the existence of special relationships between the parties in determining the issue.  An employee and employer relationship is such a relationship.

*MacCrone v. Edwards Ctr., Inc.*, 160 Or. App. 91, 100 (1999) (internal quotations and citations omitted).

To support her claim for intentional infliction of emotional distress, Schmitz relies on the same conduct that underpins her

hostile work environment claim.  Defendants contend they are entitled to summary judgment as to Plaintiff's claim because even if Schmitz's allegations are accepted as true, Defendants' conduct does not rise to the level required to establish intentional infliction of emotional distress under Oregon law. The Court agrees.  Neither Grove's conduct toward Schmitz nor Tri-Met's disciplinary action based on Schmitz's absenteeism constitutes the necessary "extraordinary transgression" of the bounds of socially tolerable conduct.  Accordingly, the Court concludes Defendants are entitled to summary judgment as to Plaintiff's claim for intentional infliction of emotional distress.

**V.    Section 1983**

Plaintiff asserts a claim against Tri-Met and Grove pursuant to 42 U.S.C. § 1983 for violation of Schmitz's constitutional right to equal protection.  An individual whose federal constitutional rights have been violated by a public official acting under color of state law may bring an action against the official for damages pursuant to 42 U.S.C. § 1983.  *Orin v. Barclay*, 272 F.3d 1207, 1214 (9th Cir. 2001).  The circumstances in which a municipality may be found liable under § 1983 are "carefully circumscribed." *See Fuller v. City of Oakland,* 47 F.3d 1522, 1534 (9th Cir. 1995).

There are various legal bases for municipal liability under

§ 1983.  A plaintiff may demonstrate liability by proving that a
city employee committed the alleged violations pursuant to the
city's official policy or custom.  *Monell v. Dept. of Soc. Serv.*,
436 U.S. 658, 694 (1978).  A plaintiff also may show the conduct
was the result of "a deliberate choice . . . made from among
various alternatives by the official or officials responsible for
establishing final policy with respect to the subject matter in
question."  *Pembaur v. City of Cincinnati,* 475 U.S. 469, 483-84
(1986).  In addition, a plaintiff may show "an official
policymaker either delegated policymaking authority to a
subordinate or ratified a subordinate's decision, approving the
decision and the basis for it."  *City of St Louis v. Praprotnik,*
485 U.S. 112, 126-27 (1988).  In any event, a municipality cannot
be liable under § 1983 based on a theory of *respondeat superior*.
*Fuller,* 47 F.3d at 1534.

        In addition, Defendants are entitled to summary judgment
under Fed. R. Civ. P. 56 only if they establish there are no
issues of material fact relevant to the legal claims at issue and
controlling legal authority requires judgment in their favor as a
matter of law.

        Defendants' argument in support of their Motion for Summary
Judgment as to Plaintiff's § 1983 claim merely consists of three
short sentences without any citation to legal authority; *i.e.,*
Defendants do not attempt to identify the applicable law under

which they might be entitled to judgment.  Defendants raise for
the first time in their Reply an additional argument that a
§ 1983 action may not be based solely on alleged violations of
the ADA.  The Court, however, need not consider arguments made
for the first time in a reply brief.  *See United States v. Bohn*,
956 F.2d 208, 209 (9th Cir. 1992) (noting courts ordinarily
decline to consider arguments raised for the first time in a
reply brief).  Because Plaintiff did not have an opportunity to
respond to Defendants' new argument, the record is not clear
whether Plaintiff's § 1983 claim, in fact, is based solely on
violations of the ADA.

Accordingly, on this record, the Court concludes Defendants
have not established they are entitled to summary judgment as to
Plaintiff's § 1983 claim.


## DEFENDANTS' MOTION TO STRIKE

Defendants argue the Court should strike portions of
Schmitz's Affidavit because it contradicts Schmitz's deposition
testimony.

"The general rule in the Ninth Circuit is that a party
cannot create an issue of fact by an affidavit contradicting his
prior deposition testimony."  *Kennedy v. Allied Mutual Ins. Co.*,
952 F.2d 262, 266 (9th Cir. 1991).  Before it disregards an
affidavit, however, the district court "must make a factual

determination that the contradiction was actually a 'sham.'"  *Id.*
at 267.  "Sham" testimony is "testimony that flatly contradicts
earlier testimony in an attempt to create an issue of fact and
avoid summary judgment."  *Id.*

Defendants argue Schmitz's statement in her Affidavit that
she "intended to start up the [cancer] treatment again in
September [2003] when I could take new leave" is contrary to
Schmitz's deposition testimony concerning the timing of her
chemotherapy.  The Court has reviewed the deposition testimony
identified by Defendants, however, and finds Schmitz's Affidavit
statement is not directly contradictory.  Schmitz testified
1) she was uncertain whether she would continue her cancer
treatment and 2) it was her understanding that if her treatment
lapsed for 30 days or more, she would not be able to resume
treatment unless her cancer was actively growing.

The Court, therefore, concludes Schmitz's Affidavit
testimony is not a sham, and, accordingly, the Court denies
Defendants' Motion to Strike.


## CONCLUSION

For these reasons, the Court **DENIES** Defendants' Motion to
Strike Portions of Plaintiff's Affidavit in Opposition to Summary
Judgment (#36) and **GRANTS in part** and **DENIES in part** Defendants'

Motion for Summary Judgment (#18).

IT IS SO ORDERED.

DATED this 15th day of December, 2005.

/s/ Anna J. Brown

_____
ANNA J. BROWN
United States District Judge